## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| **CLAUDE MCQUEEN,** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **Civil Action Number** |
| | ) | **2:14-cv-01016-WKW-TFM** |
| **STATE OF ALABAMA, STATE OF** | ) | |
| **ALABAMA DEPARTMENT OF** | ) | |
| **TRANSPORTATION, JASON BOOTH,** | ) | |
| **in his individual capacity, MIKE GRIFFIN,** | ) | |
| **in his individual capacity, and SHERRY** | ) | |
| **ELLIS, in her individual capacity,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Comes Now, the Plaintiff, by and through the undersigned, and responds to the Defendants' Motion for Summary Judgment as follows:

## I.     Introduction

In his Complaint, the Plaintiff, Claude McQueen ["McQueen"], alleged that he was denied pay equal to that received by similarly situated white employees and that he was retaliated against for reporting and opposing race discrimination in employment.  Specifically, Mr. McQueen has been denied pay raises regularly received by similarly situated white employees even though he is qualified for the position he currently occupies.  Additionally, Mr. McQueen was subjected to

retaliation when he filed charges of discrimination protesting the Defendants' unequal and discriminatory treatment of him.

Defendants deny that they have discriminated against Mr. McQueen in the award of pay increases. They premise their argument(s) at summary judgment on the "qualification" prong of the *prima facie* test for employment discrimination by stating that Mr. McQueen's inability to pass the IMSA I certification test dis-qualifies him from pay raises. Defendants reliance on Mr. McQueen's performance on a written test, ignores copious evidence that he is capable of performing the position at issue in spite of being a poor test-taker. Whether a plaintiff can pass a test is not a proper consideration at the prima facie stage of a case because there is no proof that failing to achieve a given score equates with a lack of qualification. There is substantial credible evidence here that shows Mr. McQueen was qualified regardless of what the test results said.

To inject a written test into the "qualification" prong of a prima facie case would require virtually all of the ultimate issues in the case to be litigated in that restricted context and would short-circuit the progressive sharpening of the issues that *McDonnell Douglas* was intended to foster. For if to prove "qualifications" at the prima facie stage of the case the plaintiff must show he passed a written test, then all the issues of pretext and test validity that are usually reserved for later stages of the

case and analysis must be litigated at the threshold, such as whether the test is sufficiently job related that a given score indicates lack of qualification, whether the test has been imposed selectively as a pretext for discrimination, whether there was disparate treatment or other errors in its administration or grading, etc., etc., etc. Without knowing the answers to these subsidiary questions, the test cannot be relied upon as an indicator of qualifications – but those types of questions are not proper at the prima facie stage of analysis.

The 11th Circuit has held that the plaintiff need only prove that he was minimally qualified to do the job in question, not that he can pass a test that may or may not be related to that issue, or that may or may not have otherwise been properly administered or used. The ability to do the job in question is something that exists within the plaintiff and is not readily subject to manipulation, mis-administration, mis-grading, or disparate application like a written test is. For this reason, *McDonnell Douglas* requires a plaintiff only to come forward with the evidence of his own qualifications that is within his grasp and not subject to protracted litigation of the sort inherent to the use of a written test. Here, the evidence will show that Mr. McQueen established his qualifications in spite of the test results.

With regard to Mr. McQueen's retaliation claim, the Defendants' contend that he cannot make out a prima facie case because he (1) suffered no adverse employment

action and (2) there he cannot establish a causal connection between any protected activity and an adverse employment action. Defendants' argument in this regard ignores the great weight of the evidence which shows that when Mr. McQueen reported and opposed race discrimination, soon thereafter he was subjected to materially adverse acts that would have dissuaded a reasonable employee from making or supporting further charges of discrimination.

Defendants' motion for summary judgment, therefore, is due to be denied because when viewing the facts in the light most favorable to Mr. McQueen it is readily apparent that (1) he was qualified for the job he currently occupies and therefore eligible for raises and (2) he was retaliated against for asserting his rights under Title VII.

## II.     Statement of Undisputed Facts

### A.     McQueen Work History

The Plaintiff, Claude McQueen, began working for the State of Alabama on February 8, 1993. [McQueen Dep. p. 15: ln. 18-p. 16: ln. 5; Dep. p. 25: ln. 20-p. 26; ln. 5; Dep. p. 40: lns. 14-20]. McQueen is African-American and is fifty-seven (57) years old. [McQueen Dep. p. 253: ln. 1-p. 256: ln. 1; McQueen Dep. p. 11: lns. 1-4] McQueen's first job with the state was as a Highway Maintenance Technician I. [McQueen Dep. p. 40: lns. 14-20; Dep. p. 41: lns. 13-16]. His duties and

responsibilities as a Highway Maintenance worker included patching roads, cutting grass, weed eating, and maintaining the highways. [McQueen Dep. p. 41: lns. 1-4]. McQueen worked in this position for approximately eighteen-years (18). [McQueen Dep. p. 41: lns. 5-6].

On or about February 10, 2008, McQueen applied for the position of Traffic Signal Technician with the Alabama Department of Transportation. [Ex. 1-McQueen Application]. The Traffic Signal Technician is a permanent full-time position with the Department of Transportation and positions are located throughout the state. [Ex. 2-Traffic Signal Technician Job Description 2008]. The successful applicant does technical electrical work in installing and maintaining highway traffic control devices within an assigned area of the state. [Id.]. McQueen was awarded the position on November 17, 2009. [Ex. 3-McQueen Appt. Letter]. The minimum requirements for the Traffic Signal Technician position were:

●Completion of 10th grade and two (2) years of work experience performing electrical, and/or signal work
or
●Completion of two (2) years in a vocational, trade or technical school in the Electronics or Electrical field. [Ex. 2-Job Description for Traffic Signal Technician].[1]

[1]By 2011 the State Personnel Department added a third way for an applicant to qualify for the Traffic Signal Technician position, which was as follows:

●Certification as an International Municipal Signal Association [IMSA] Traffic Signal Technician Level I. [Ex. 4-Traffic Signal Technician Job Description 2011].

McQueen met the minimum requirements for the position as he is a college graduate and had the requisite electrical work experience. [McQueen Dep. p. 14: ln. 21-p. 15: ln. 21; Dep. p. 44: ln. 3-p. 47: ln. 23]. McQueen's electrical experience came from his having performed that type of work for various companies before he became a State of Alabama employee. [Id.]. The salary range for Transportation Safety Technician is $27,806.40 - $46,615.20. [Ex. 5-2015-2016 Merit System Employment Guide]. McQueen currently earns $40,413.00. [McQueen Dep. p. 182: lns. 5-8]. In 2014, McQueen made $39,933.32 . [Aff. of Sandra Kelly at ¶3]. Nowhere in the job description for Traffic Signal Technician does it mention that the successful applicant must possess a International Municipal Signal Association (IMSA) Traffic Signal Technician Level I certification. [See, Exs. 2& 4- Traffic Signal Technician Job Descriptions]. McQueen was never told that he had to have an IMSA certification to remain employed. [McQueen Dep. p. 169: lns. 1-21].

McQueen is proficient at the following Traffic Signal Technician tasks: traffic signal installations, traffic signal maintenance, troubleshooting, pole installation, putting up traffic lights, repairing switch boxes, programming school clocks, building two-way and four-way flashers, and wiring two-way and four-way flashers.

---

A successful applicant only had to satisfy one of the three options listed in the minimum requirements section of the job announcement.

[McQueen Dep. 170: ln. 21-p. 175: ln. 13].

## B.    IMSA Test

The IMSA test certifies that the test taker is familiar with basic concepts and terminology associated with signalized traffic systems. [McQueen Dep. p. 60: ln. 4-p. 61: ln. 14].  The Defendants began compelling McQueen to take the IMSA Traffic Signal Certification Level I exam in 2010.  [McQueen Dep. p. 64: ln. 21-p. 65: ln. 5]. Since 2010, McQueen has taken the test five times and has yet to pass it. [McQueen Dep. p. 65: ln. 9-p. 68: ln. 13].  The IMSA test has no bearing on McQueen's ability to do his job as he was and still is performing as a Traffic Signal Technician. [McQueen Dep. p. 69: ln. 8-p. 70: ln. 5; McQueen Dep.  170: ln. 21-p. 175: ln. 13].

## C.    McQueen Is Discriminatorily Denied Raises

By virtue of his length of  tenure as a state employee, McQueen makes more money than the white Traffic Signal Technicians on his crew. [McQueen Dep. p. 179: ln. 15-p. 180: ln. 17].  White Traffic Signal Technicians who are comparators for McQueen are Donald Dansby, Marcus Sanders, Josh Grissett, and Justin Sanders.[2] [McQueen Dep. p. 184: ln. 3-p. 186: ln. 22].  These individuals have received step

_____

[2]For Fiscal Year 2014 McQueen was paid $39,933.32, Donald Dansby was paid $32, 638.69, Marcus Sanders was paid $8,953.80, Josh Grissett was paid $31,942.38, and Justin Sanders was paid $26,423.79. [Aff. of Sandra Kelly at ¶3].  All of these individuals are classified as Traffic Signal Technicians by the State Personnel Department. [See, Ex. 5- State Personnel Department Merit System Employment Guide].

raises while McQueen was denied.[3] [McQueen Dep. p. 180: lns. 7-17]. Defendant Jason Boothe [white male], McQueen's supervisor, informed him that if he did not obtain an IMSA certification he would not receive a step raise. [McQueen Dep. p. 189: ln. 5-p. 192: ln. 15]. Boothe had awarded McQueen the raise but then rescinded because he did not pass the IMSA exam. [Id.].

### D. McQueen is Assaulted by a White Co-Worker

Josh Grissett, white male, is a Traffic Signal Technician Senior in the Troy Area Office. On April 22, 2014, Grissett and McQueen were riding together in a state truck when Grissett's hard hat fell off the top of it. [McQueen Dep. p. 111: ln. 2-p. 112: ln. 18]. McQueen and Grissett both heard the hard hat hit the ground. [Id.]. Grissett then shoved McQueen back into his seat and then called him a "Goddamned Motherfucker." [Id.]. Upon arriving at the job site, McQueen immediately sought out Supervisor Jimmy Barron to report Grissett's assault. [Id.]. McQueen wrote the incident up. [Id.]. The very next day, McQueen gave a copy of what he had given to Barron to Maintenance Engineer Sherry Ellis [white female], Traffic Engineer Jason Boothe [white male], and Division Engineer Mike Griffin. [Id.; McQueen Dep. p. 114: lns. 8-18]. Prior to this incident, Grissett frequently belittled McQueen and

---

[3]McQueen is the only African-American in his crew. [McQueen Dep. p. 93: ln. 20-p. 94: ln. 6].

talked down to him. [McQueen Dep. p. 117: lns. 8-21]. Crew members reported to McQueen that Grissett openly expressed hatred towards him. [McQueen Dep. p. 119: lns. 3-13; McLeod Decl. at ¶3].

Jimmy Barron testified that he took McQueen's complaint to Boothe and Ellis. [Ex. 6-Barron Decl. at ¶5]. Boothe and Ellis took no action regarding McQueen's complaint of workplace violence.[4] [Id.]. Grissett's act of violence was grounds for immediate termination. [Id.]. Grissett admitted to "touching" McQueen on the shoulder and saying "stay out of my damn way." [Grissett Decl. at ¶¶18-19].

About four-weeks after this incident occurred, Boothe convened a meeting with McQueen, Brenda Kirkland, and Grissett. [McQueen Dep. p. 114: ln. 19-p. 116: ln. 4]. During the meeting, McQueen and Grissett expressed their competing versions of what happened. [Id.]. At the conclusion of the meeting, Grissett offered his hand to McQueen and stated that he was sorry. [Id.]. McQueen refused to shake Grissett's hand and did not accept his apology as he felt it was not sincere. [Id.]. McQueen never heard anything else about this meeting or the incident and still was required to work around Grissett. [Id.; McQueen Dep. p. 161: ln. 1-p. 162: ln. 5; Dep. p. 163: ln.

---

[4]Jennifer McLeod, an Administrative Assistant with the Department of Transportation, heard white employees Sherry Ellis, Glenda Uptain, Pam Leverette, and Brenda Kirkland refer to McQueen as a "dumb nigger" during a conversation. [Ex.7 -McLeod Decl. at ¶4]. These white employees also often made disparaging comments about McQueen's intelligence. [Ex. 7-McLeod Decl. at ¶4].

5-p. 165: ln. 19].  When this incident occurred McQueen was fifty-four (54) and Grissett was in his thirty's. [Id.].  To McQueen's and Barron's knowledge Grissett received no punishment for assaulting and cursing McQueen. [Barron Decl. at ¶5; McQueen Dep. p. 161: ln. 1-p. 162: ln. 5; Dep. p. 163: ln. 5-p. 165: ln. 19].

The State of Alabama Department of Transportation's Violence in the Workplace Policy states, in relevant part:

> ### I.      General
>
> The Alabama Department of Transportation (ALDOT) is committed to maintaining a work environment as free as possible from violence, threats of violence, or intimidation.  The goal of this policy is to prohibit behavior which is intended to intimidate, alarm or injure another person.  ALDOT will not tolerate this type of behavior.  **An employee who violates this policy will be subject to discipline, up to and including termination.**  Any person who exhibits this type of behavior, while engaged in business with ALDOT or on ALDOT property may be required to leave, and law enforcement personnel may be contacted to terminate the situation. [Ex. 8-Violence in Workplace and Weapons Policy Revised 7/24/2013].

### E.      McQueen Files an EEOC Charge

On May 20, 2014, McQueen filed a charge of discrimination with the Birmingham District Office of the Equal Employment Opportunity Commission ["EEOC"] alleging that he had been subjected to  race and age discrimination and retaliation. [Ex. 9-May 20, 2014 EEOC Charge; McQueen Dep. p. 257: ln. 1-p. 258 ln. ].  McQueen's charge specifically alleged that he had been subjected to a hostile

working environment, race discrimination, and unequal pay. [Ex. 9-May 20, 2014 EEOC Charge]. By letter dated May 23, 2014, EEOC Investigator Jonathan Jones notified McQueen that the document he had filed on May 20, 2014 was a charge of discrimination and that his employer had been notified of its filing. [Ex. 10-May 23, 2014 correspondence]. A Notice of Discrimination was mailed to the Alabama Department of Transportation on May 23, 2014. [Ex. 11-Notice of Charge of Discrimination].

### F.    The Defendants Retaliate Against McQueen

Six days [May 29, 2014] after the EEOC mailed the Notice of Charge of Discrimination to the Alabama Department of Transportation, McQueen was subjected to a suspiciously timed drug test. [McQueen Dep. p. 96: ln. 16-p. 97: ln. 22]. Two weeks prior to McQueen being tested on May 29, 2014, twenty (20) employees in his section were tested. [McQueen Dep. p. 96: ln. 16-p. 97: ln. 22]. This was uncommon because McQueen was required to go to a private doctor for his test and this protocol is only used when an individual missed the group testing. [Id.]. McQueen had not missed the group testing as he was not part of the sample. [Id.]. Barron found the Defendants' action in this regard to be suspicious as well. [Ex. - Barron Decl. at ¶10]. McQueen had never observed an instance where only one person was initially chosen for a random drug screen. [McQueen Dep. p. 126: ln. 19-

p. 129: ln. 10].   Similarly, after McQueen filed his charge Boothe attempted to reprimand him for a performance issue. [McQueen Dep. p. 98: ln. 4-p. 99: ln. 8; Dep. p. 131: lns. 8- 22; Dep. p. 148: ln. 16-p. 149: ln. 21].  Jimmy Barron testified that after McQueen filed his EEOC charge Boothe approached him [Barron] and questioned him extensively about his [McQueen] job performance.  [Ex. 6-Barron Decl. at ¶9]. Boothe then gave McQueen a low job rating. [Ex. 6-Barron Decl. at ¶9].  Boothe did not question Barron about any of the other crew members. [Id.].

## III.   <u>SUMMARY JUDGMENT STANDARD</u>

In *Hinson v. Clinch County,* 231 F.3d 821 (11th Cir. 2000), the Eleventh Circuit set forth the applicable standard of review  for summary judgment, it is as follows:

> "A court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weight the evidence." * * * "[T]he court should give credence to the 'evidence favoring the non-movant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that evidence comes from disinterested witnesses." Id. In other words, we must consider the entire record, but "disregard all evidence favorable to the moving party that the jury is not required to believe." Id. (citations omitted)(quotations from *Reeves v. Sanderson Plumbing,* 530 U.S. 133 (2000)).

**IV.** **Argument**

**A.** **McQueen makes out a prima face case of race discrimination.**

To establish a prima facie case for disparate treatment in a race discrimination case, Plaintiff must demonstrate that (1) he is member of a protected class; (2) he was subjected to an adverse employment action; (3) his employer treated similarly situated employees outside his protected class more favorably than he was treated; and (4) he was qualified to do the job. See *Maniccia v. Brown,* 171 F.3d 1364, 1368 (11th Cir.1999). Discharging this burden is not onerous. *Tex. Dept. of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The Plaintiff need only establish facts adequate to permit a discriminatory inference. *Holifield v. Reno,* 115 F.3d 1555, 1562 (11th Cir.1997); *Burke-Fowler v. Orange County,* 447 F.3d 1319, 1323 (11th Cir. 2006).

Here, it is undisputed that McQueen belongs to a protected class [African-American], however, the Defendants dispute whether McQueen has suffered an adverse employment action, was treated less favorably than similarly situated employees outside his protected class, and was qualified for his job. As will be shown, each of these contentions is without merit.

First, "the denial of a pay raise of any significance clearly affects an employee's compensation and thus constitutes an adverse employment action under Title VII."

*Crawford v. Carroll,* 529 F.3d 961, 971-2 (11th Cir. 2008). In the instant case, McQueen testified clearly and unequivocally that he received fewer raises than his white counterparts [Dansby, Grissett, J. Sanders and M. Sanders]. [McQueen Dep. p. 179: ln. 15-p. 180: ln. 17; McQueen Dep. p. 184: ln. 3-p. 186: ln. 22; McQueen Dep. p. 180: lns. 7-17]. McQueen also testified, which has not been disputed, that his overall compensation was higher than the whites because of his length of tenure with the state, not because he had been paid in a non-discriminatory manner. Thus, the Defendants' argument that McQueen suffered no adverse employment action by being denied the same raises as whites because he still made more than them is red herring. McQueen should have received the raises he earned and was qualified for based on his performance and to deny them because of his race was unlawful and discriminatory. To hold otherwise would endorse the inference present in the Defendants' argument which is that as an African-American [McQueen] should be content in the fact that he is making more money than the whites even though in the absence of discrimination he would have made more. This reasoning goes against the anti-discrimination laws and thus must be rejected.

Second, Defendants' contention that McQueen cannot point to any similarly situated comparators is equally as wrongheaded. White Traffic Signal Technicians Dansby, J. Sanders, Grissett and M. Sanders all perform the same duties, the only

difference is that Grissett is a working supervisor. Defendants dispute that McQueen is similarly situated to Grissett because they are in different pay classifications. This is a distinction without a difference as the State Personnel Department Merit System Employment Guide makes no such distinction in job title and duties.[5] [Ex. 5-2015-2016 Merit System Employment Guide]. Defendants' further aver that McQueen is not similarly situated to the remaining individuals because he has not passed the IMSA test. The IMSA test is not a requirement for the Traffic Signal Technician position. There are two other methods to qualify for the job, one of which McQueen fell under when he was hired on. Moreover, it is undisputed that passing the IMSA is not a pre-requisite for receiving a raise. Thus, McQueen is similarly situated to Dansby, J. Sanders, Grissett and M. Sanders in all relevant aspects.

Third, McQueen's length of incumbency in his job and his testimony that he could perform it proficiently satisfies the qualifications prong of the prima facie analysis. With regard to the qualifications prong of the prima facie case, the Eleventh Circuit has held that "if a plaintiff has enjoyed a long tenure at a certain position, we can infer that he or she is qualified to hold that particular position."*Damon v. Fleming*

---

[5]With regard to similarly situated the 11th Circuit holds that "the relevant inquiry is not whether the employees hold the same job titles, but whether the employer subjected them to different employment policies." *Lathem v. Dep't of Children & Youth Servs.,* 172 F.3d 786, 793 (11th Cir.1999).

*Supermarkets of Florida, Inc.,* 196 F.3d 1354, 1360 (11th Cir.1999); *Pace v. Southern Railway Sys.,* 701 F.2d 1383, 1386 n. 7 (11th Cir.1983) (finding that "where a plaintiff has held a position for a significant period of time, qualification for that position, sufficient to satisfy the test of a prima facie case can be inferred"). Thus, McQueen satisfies the qualifications prong of the *prima facie* case analysis.

Furthermore, at the *prima facie* stage, McQueen is not required to show that he has qualifications that were not required for the job. *Randle v. City of Aurora,* 69 F.3d 441, 453-454 (10th Cir. 1995) (". . . this fact may not disqualify her for the position if the requirement of college training was not a genuine prerequisite for the position. Randle highlights the fact that the City retained Richards in this position even when it discovered that she did not meet the stated requirement"). Additionally, "McDonnell Douglas requires only a minimal showing of qualification to establish a prima facie claim" by producing evidence that the plaintiff "possessed the basic skills necessary for performance of the job." *Owens v. New York City Housing Auth.,* 934 F.2d 405, 409 (2d Cir. 1991); see also *Carter v. Three Springs Residential Treatment,* 132 F.3d 635, 643 (11th Cir. 1998) (Eleventh Circuit requiring only proof of "minimum qualifications"); *East v. Romine, Inc.,* 518 F.2d 332, 338 (5th Cir. 1975) ("She . . . was at least presumptively qualified on the basis of an application which showed a long history of welding work."). Here, Boothe premised

McQueen's receiving a raise on his passing a test which was a qualification that was not required by the state. This was discriminatory.

Thus, it must be held that McQueen has made out a *prima facie* case.

**B.  Summary Judgment Is Inappropriate Because Genuine Issues Of Material Fact Exist With Regards To McQueen's Retaliation Claim.**

To establish a prima facie case of retaliation under Title VII or 42 U.S.C. § 1981, McQueen must show: (1) that he engaged in statutorily protected conduct; (2) that he suffered an adverse employment action; and (3) the adverse action was causally related to the protected expression. *Goldsmith v. Bagby Elevator Co. Inc.,* 513 F.3d 1261, 1277-78 (11th Cir. 2010)(citation omitted). The causal link requirement is interpreted broadly so that the plaintiff must only show that the protected activity and the negative employment action are not wholly unrelated. *Goldsmith v. Bagby Elevator Co. Inc.,* 513 F.3d 1261, 1277-78 (11th Cir. 2010). Here, the Defendants contend that (1) McQueen suffered no adverse employment action and (2) he cannot establish causation. Defendant's contentions are simply wrong as McQueen testified that the Defendants subjected him to a contrived drug screen and reprimand after he engaged in protected activity.[6]

---

[6]Jimmy Barron testified that after McQueen filed his EEOC charge Boothe approached him [Barron] and questioned him extensively about his [McQueen] job performance. Boothe then gave McQueen a low job rating. [Ex. 6-Barron Decl. at ¶9].

**1.     The drug screen on May 29, 2014 and the threatened reprimand, are adverse employment actions under *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S.ct. 2405, 165 L.Ed. 345 (2006).**

Under Burlington, employer conduct that falls short of an ultimate employment decision or a substantial employment action can be categorized as an adverse employment action. *Crawford v. Carroll,* 529 F.3d 961, 973-74 (11th Cir. 2008). Such action(s) must have a materially adverse effect on the plaintiff in that it "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Crawford,* at 974 (citation omitted). In determining whether the requisite level of adversity is reached, courts are advised to examine the alleged adverse actions in the aggregate. *Woods v. Austall, U.S.A., LLC,* 2011 WL 1380054 (S.D.Ala.)(April 11, 2011)(citations omitted). More importantly the Eleventh Circuit has held that, "it is for a jury to decide whether anything more than most petty and trivial actions against an employee should be considered 'materially adverse' to him and thus constitute adverse employment actions." *Crawford,* at 973.

With respect to the contrived drug screen and the reprimand at issue here, it cannot be "seriously debated that a reasonable employee might be dissuaded from complaining of unlawful discrimination" after being subjected to such treatment. *Woods v. Austall, U.S.A., LLC,* 2011 WL 1380054 p. 27 (S.D.Ala.)(April 11, 2011)(reasonable person might be dissuaded from complaining of unlawful

discrimination after having welding certificate suspended and being subjected to repeated verbal and written discipline). Defendants conduct here constitute material adverse employment actions.

### 2. A Fact Question Exists as to Whether The Decision Makers Were Aware of McQueen's Protected Activity.

As stated supra, the Eleventh Circuit construes the causal connection element of a retaliation case expansively. So much so that to establish causation a plaintiff simply has to demonstrate that the decision maker was aware of the protected conduct at the time of the adverse employment action. *Goldsmith v. Bagby Elevator Co., Inc.,* 513 F.3d 1261, 1278 (11th Cir. 2008)(citations omitted); *Goldsmith v. City of Atmore,* 996 F.2d 1155, 1163 (11th Cir. 1993). Defendants argue that McQueen cannot establish a causal link because he cannot show that the decision makers were aware of May 20, 2014 EEOC charge at the time of he was "randomly" selected for a drug test on May 29, 2014. However, the undisputed evidence says different.

It is undisputed that on May 20, 2014, the EEOC stamped as received a letter from McQueen that it interpreted to be a charge of discrimination. [Ex. 9-May 20, 2014 EEOC Charge; Ex. 10-EEOC Letter Dated May 23, 2014]. It is equally undisputed that the EEOC mailed a Notice of Charge of Discrimination to the Alabama Department of Transportation on May 23, 2014. [Ex. 11-May 23, 2014

Notice of Charge of Discrimination]. Assuming the three-day mailing rule, the Alabama Department of Transportation received the Notice of Charge of Discrimination on or about May 27, 2014. McQueen was tapped for a contrived drug screen two-days later. *Zillyette v. Capital One Financial Corp.,* 179 F.3d 1337 (1999). "Close temporal proximity between protected conduct and an adverse employment action is generally 'sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection.' " *Jones v. Gulf Coast Healthcare of Delaware, LLC,* 2017 WL 1396165, *7 (11th Cir. April 19, 2017). Thus, a fact question exists with regards to whether the contrived drug screen was initiated in retaliation for McQueen's protected activity.

Similarly, there is evidence that suggests that the threatened reprimand was in response to McQueen's protected activity. Specifically, Boothe's questioning of Barron on the topic of McQueen's job performance while excluding the other crew members from any such inquiry after McQueen had initiated his EEOC complaint. [Ex. 6-Barron Decl. at ¶9]. Therefore, because material issues of fact exist with regard to the causation prong of the retaliation analysis, summary judgment is improper.

**C.**     **The Individual Defendants Should Have Known That Race Discrimination Violated Clearly Established Statutory and/or Constitutional Rights.**

It almost goes without saying that in May 2014, it was clearly established that intentional discrimination in the workplace on account of race violated federal law. *Bogle v. McClure,* 332 F.3d 1347, 1355 (2003); *Alexander v. Fulton County, Ga.,* 207 F.3d 1303, 1321 (11th Cir.2000).   Boothe, Ellis and Griffin are not entitled to qualified immunity for the intentional discrimination directed towards McQueen as set forth above.

**IV.**     **Conclusion**

Based on the foregoing facts and authority, the Defendants' Motion for Summary Judgment is due to be denied.

Respectfully submitted,

*/s/Roderick T. Cooks*
Roderick T. Cooks
Attorney for the Plaintiff

**OF COUNSEL:**
WINSTON COOKS, LLC
505 20th Street North
Suite#815
Birmingham, AL 35203
(205) 502-0970     Tel
(205) 278-5876     Fax
rcooks@winstoncooks.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served via electronic mail and/or by placing a copy of the same in the U.S. mail, postage prepaid, and addressed as follows:

Gilda Branch Williams, Esq.
Robert Prescott, Esq.
State of Alabama Office of the Attorney General
501 Washington Avenue
Montgomery, AL 36104
(334) 242-7300

DONE this the **20**th day of April, 2017.

/s/Roderick T. Cooks
OF COUNSEL