IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| CLAUDE MCQUEEN, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:14-cv-1016-DAB |
| | ) | |
| ALABAMA DEPARTMENT | ) | |
| OF TRANSPORTATION, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff, Claude McQueen, claims racial discrimination and retaliation against his employer, Alabama Department of Transportation, and three individual supervisors. He filed this lawsuit in October 2014, and the operative complaint is Plaintiff's Second Amended Complaint filed in June 2015. (Docs. 1, 33). This matter is before the court on the Defendants Sharon Ellis, Jason Boothe, Mike Griffin, and Alabama Department of Transportation's construed Motion for Summary Judgement and Memorandum Brief in Support (Docs. 56, 57).[1] The parties have had an opportunity to fully brief the issues. For the reasons stated herein, Defendants' construed motion (Doc. 56) is **granted**.

Also before the court is Defendants' Motion to Strike Jennifer McLeod's Declaration. (Doc. 79). The McLeod Declaration (Doc. 78-2 at 7–8) was submitted by Plaintiff to support his response in opposition to the Defendants' summary judgment motion. Plaintiff has failed to respond to the motion to strike and thus the motion is deemed unopposed. However, to the extent that any fact in the

---

[1] Doc. 56 is titled Memorandum Brief in Support of Motion for Summary judgment and is docketed as a memorandum brief, but the body of the pleading indicates it is a Rule 56, Fed. R. Civ. P., motion for summary judgment, and thus the court construes Doc. 56 as a motion. The memorandum brief in support is docketed at Doc. 57.

Declaration conflicts with other evidence, the facts are construed in the light most favorable to Plaintiff as the non-moving party. Because the court concludes on this record in a light most favorable to the Plaintiff that Defendants are entitled to final summary judgment in their favor, Defendants' motion to strike the Jennifer McLeod Declaration (Doc. 79) is **denied as moot**.

## I. JURISDICTION

McQueen's claims for retaliation and discrimination are based on race under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* as amended by the Civil Rights Act of 1991, 42 U.S.C. § 1981 by and through 42 U.S.C. § 1983, 42 U.S.C. § 1981a, and the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States Constitution. All claims arise under federal law, and the court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 1343. The parties do not dispute venue or personal jurisdiction, and there are adequate allegations in Plaintiff's Second Amended Complaint to support both. On March 22, 2017, the parties consented to Magistrate Judge Jurisdiction for all matters pursuant to Rule 73, Fed. R. Civ. P., and 28 U.S.C. § 636(c), and an order was entered reassigning the case to the undersigned as the presiding judge. (Docs. 67, 69).

## II. SUMMARY JUDGMENT STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on a motion for summary judgment, the Court construes the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). However, when faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the

burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." *Sawyer v. Southwest Airlines Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250–51 (1986)).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Sawyer*, 243 F. Supp. 2d at 1263 (quoting *Anderson*, 477 U.S. at 251–52).

## III. BACKGROUND AND FACTS

The matters set forth here are either undisputed or stated, as they must be for purposes of the present motion, in the light most favorable to Plaintiff Claude McQueen ("McQueen" or "Plaintiff"), the non-moving party. McQueen, an African-American male, began working for the State of Alabama on February 8, 1993. (Doc. 58-1 at 16:1; 25:20–23). He was born in 1959. *Id.* at 11:2. His first job with the State was as a Highway Maintenance Technician I. *Id.* at 40:17–18; (Doc. 58-2 at 41:13–16). He worked in this position for eighteen years. (Doc. 58-2 at 41:5–6). He did not do any electrical work during this time. *Id.* at 41:17–19. He got his commercial driver's license eight or nine years after starting work for the State. (Doc. 58-1 at 15:20–16:5). His duties as a highway maintenance worker included patching roads, cutting grass, weed eating, and maintaining the highways. *Id.* at 41:1–4.

In February 2008, McQueen applied for the position of Traffic Signal Technician with the Alabama Department of Transportation ("ALDOT"). (Doc. 78-1 at 2–4). The position is full-time and involves "technical electrical work in installing and maintaining highway traffic control devices." *Id.* at 6. McQueen was awarded the position effective December 1, 2009. *Id.* at 8. At the time McQueen applied, the minimum requirements for the position were either: (1) completion of tenth grade and two years of work experience performing electrical and/or signal work; or (2) completion of two years in a

vocational, trade or technical school in the electronics or electrical field. *Id.* at 6. McQueen graduated from Alabama State University with a degree in criminal justice and a minor in psychology. (Doc. 58-1 at 15:3–5). He had some electrical experience with other companies before becoming a State of Alabama employee. (Doc. 58-2 at 44:6–46:19).

By 2011 the State Personnel Department added certification through International Municipal Signal Association (IMSA) as a third way an applicant can qualify for the Traffic Signal Technician Level I position, but IMSA certification is not a requirement for the position. (Doc. 78-1 at 10, 13). McQueen has taken the IMSA test five times since 2010 but has not passed the test. (Doc. 58-2 at 66:1–68:20).

The salary range for Traffic Signal Technician is $27,806.40–$46,615.20. (Doc. 78-1 at 13). In September 2016, McQueen testified he earns $40,413.00. (Doc. 58-5 at 182:8). McQueen alleges the Traffic Signal Technicians who are his comparators are Donald Dansby, Marcus Sanders, Josh Grissett, and Justin Sanders, all of whom are white. (Doc. 77 at 7). Salaries in 2014 for these individuals were as follows: $39,933.32 for McQueen; $32,638.69 for Donald Dansby; $8,953.80 for Marcus Sanders; $31,942.38 for Josh Grissett; and $26,423.79 for Justin Sanders. (Doc. 60-5). Although McQueen is paid a higher salary, he contends this is due to his longer tenure as a State employee. (Doc. 58-5 at 181:1–17). He asserts he was denied step raises while his white comparators were not. *Id.* at 180:7–17. He testified his white male supervisor, Defendant James Boothe ("Boothe"), took his step raise away because he did not pass the IMSA test and therefore did not obtain IMSA certification. *Id.* at 189:5–192:15.

McQueen, who is the only African-American member of his crew, testified that his racial discrimination claim is based on mistreatment by his fellow crew member, Josh Grissett ("Grissett'). (Doc. 58-3 at 94:2–4, 94:20–95:5). On April 22, 2014, McQueen was riding in a State truck with Grissett. (Doc. 58-3 at 111:4–20). Grissett is a white male who is a Traffic Signal Technician Senior in the Troy area office. (Doc. 77 at 8). Grissett was driving; McQueen was in the passenger seat. (Doc.

4

58-3 at 111:14–15). As they were going down the road, Grissett's hard hat fell off the truck, and McQueen and Grissett heard it hit the ground. *Id.* at 111:15– 16. McQueen sat up in his seat to look in the side mirror to see what had fallen. (Doc. 58-4 at 1–10). According to McQueen, Grissett said to him. "Sit back Goddamn it. Sit back MF." (Doc. 58-3 at 112:2). McQueen claims Grissett called him a "Goddamned Motherfucker" and shoved or pushed him back into his seat. (Doc. 77 at 8; 58-4 at 123:3–5). Grissett cursed him "very loud in a nasty way." (Doc. 58-4 at 122:20–22). When they arrived at the jobsite, McQueen reported the incident to senior crew leader Jimmy Barron. (Doc. 58-3 at 112:10–12; 114:8–10).

Both Barron and McQueen wrote the incident up. *Id.* at 112:13. The next day McQueen gave a copy of his incident report to maintenance engineer Sherry Ellis ("Ellis"), and left copies of the report on the desks of traffic engineer Boothe and division engineer Mike Griffin ("Griffin"). *Id.* at 112:14–18; 114:13–16. Two weeks later Boothe called McQueen about the need to resolve the incident. *Id.* at 114:21–115:4. A week or two after that, McQueen met in Boothe's office with Grissett, Boothe, and Brenda Kirkland. *Id.* at 115:4–8. McQueen testified they discussed the incident. *Id.* at 115:9–23. Grissett denied shoving or cursing McQueen, but admitted he said "damn" and may have touched Grissett. *Id.* Grissett apologized to McQueen; McQueen did not accept his apology. *Id.*

Before the incident in the truck, McQueen told Boothe on several occasions that he was having a problem with Grissett and did not need to be around him. *Id.* at 116:5–23. McQueen testified Boothe did nothing about it and told McQueen that he and Grissett had to work it out. *Id.* at 117:1–4. McQueen testified that Grissett belittled him at the job site saying he did the work incorrectly.[2] *Id.* at 117:11–118:7. McQueen did not like the tone Grissett used with him or the way Grissett treated him as a person. *Id.* He heard from Donald Dansby and Justin Sanders that Grissett said he hated McQueen.

---

[2] McQueen testified Grissett would make "smart remarks" to him such as, "That ain't done right;" "That ain't the way that's done;" and "You need to do that better." (Doc. 58-3 at 106:20–23).

5

*Id.* at 119:10–120:9. Grissett did not curse McQueen prior to or after the April 2014 incident. (Doc. 58-4 at 124:2–6).

McQueen filed a charge of discrimination with the Birmingham District Office of the Equal Employment Opportunity Commission ("EEOC") on May 20, 2014. (Doc. 78-2 at 12–13). By letter dated May 23, 2014, the EEOC acknowledged receipt of the charge, advised him his employer had been notified, and requested additional information. *Id.* at 15.

Regarding his retaliation claim, McQueen testified he believes he was drug tested in retaliation for filing a charge of discrimination with the EEOC. *Id.* at 129–132. In May 2014 a company came to random drug test 20 to 25 ALDOT employees. *Id.* at 129:2–21; Doc. 58-3 at 96:18–23. He was not selected to be drug tested at that time.[3] (Doc. 58-4 at 129:22–23). He testified that, at some point within the next two weeks, ALDOT learned he had a charge of discrimination pending with the EEOC. *Id.* at 130:7–20. Two weeks after the group of employees were tested, Ellis called McQueen and Jimmy Barron and told Barron he needed to take McQueen to the doctor to be drug tested. *Id.* at 130:20–131:7. Barron took him to be tested on May 29, 2014. *Id.* at 131:6–7, 133:12–13. McQueen believes ALDOT sending him to be drug tested was retaliation because it was not the norm for a large group of people to be tested and then two weeks later only one employee is sent to be tested by a private doctor. *Id.* at 131:9–16. He believes his employer received notice of his charge of discrimination, and they were trying to "find something on him" by sending him to be drug tested. *Id*. at 131:15–22. McQueen passed the drug test and has never had a positive drug screen since being employed with the ALDOT. *Id.* at 132:12–23; (Doc. 60-1 at 36).

---

[3] It appears undisputed that random drug testing is standard for ALDOT employees holding commercial driver's licenses. (Doc. 58-4 at 129:11–23). McQueen has been drug tested since being employed with the DOT in 1993 or 1994, and he has never had a positive screen. *Id.* at 132:16–133:1.

McQueen alleges Boothe attempted to reprimand him for a performance issue at some point after the EEOC charge had been filed which he asserts is another basis of his retaliation claim. (Doc. 58-3 at 98:10–99:10).

In opposition to Defendants' motion, McQueen filed the Declaration of Jimmy Barron, a white male employee of ALDOT. (Doc. 78-2 at 2–5). Barron has been employed by ALDOT for over thirty years and supervises a crew of five Traffic Signal Technicians, including Grissett and McQueen. *Id.*, ¶¶ 2, 3. In April 2014, Barron reported to Boothe that Grissett had a punctuality problem, attendance problem, was uncooperative with co-workers, and was causing McQueen problems when they worked together, but Boothe took no corrective action. *Id.*, ¶ 4. When McQueen reported the incident in the truck with Grissett to Barron, Barron told both Boothe and Ellis about it, but he was unaware of them taking any action. *Id.*, ¶ 5. Barron states that McQueen was subjected to discipline for much lesser rules infractions, and yet Grissett was not disciplined for his assault of McQueen or his violations of ALDOT's rules and procedures. *Id.*, ¶¶ 7, 8, 10. After McQueen shared with Barron that he had filed papers with the EEOC, Boothe questioned Barron about McQueen's performance and then gave McQueen a low job rating. *Id.*, ¶ 9.

McQueen also submitted the Declaration of Jennifer Stephens McLeod ("McLeod"). (Doc. 78-2 at 7–8). While an employee of ALDOT, McLeod observed Grissett intensely disliked McQueen. *Id.*, ¶ 3. McLeod states she overheard female employees, Sherry Ellis, Glenda Uptain, Pam Leverette, and Brenda Kirkland, make disparaging remarks about McQueen's intelligence, including one of them referring to McQueen as a "dumb nigger." *Id.*, ¶ 4.

Defendants have moved to strike the Declaration of Jennifer McLeod. (Doc. 79). Although the Declaration is dated November 9, 2016, McQueen did not disclose the substance of McLeod's knowledge until filing her Declaration in April 2017 in opposition to Defendants' motion. The disparaging remarks made by the white female employees were not identified in the initial disclosures. Additionally, in his deposition taken in September 2016, McQueen testified he did not know what

7

McLeod knew. (Doc. 58-1 at 32:2–22). McQueen has not filed a response opposing the motion to strike.

Defendants filed the affidavit of Samuel L. Martin, Safety Coordinator for ALDOT. (Doc. 60-1). His duties as Safety Coordinator include coordinating an effective drug and alcohol testing program in compliance with state and federal law for ALDOT commercial driver's license holders. *Id.*, ¶ 4. McQueen is subject to random drug and alcohol tests because he holds a commercial driver's license. *Id.*, ¶ 8. ALDOT does not select the manner, collection site, or method of drug and alcohol testing of ALDOT employees. *Id.*, ¶ 6. On April 30, 2014, McQueen was randomly selected by Safety First, the company that ALDOT hired to perform the alcohol and drug testing, to be tested in a district in which he does not work. *Id.*, ¶ 9. It is not uncommon for Safety First to randomly select an employee in a district in which he or she does not work. *Id.*, ¶ 10. When that happens, Safety First will require the employee to be tested in his or her district as soon as practicable. *Id.* McQueen was tested on May 29, 2014, and the results of the test were negative. *Id.*, ¶¶ 11, 13.

## IV. PLAINTIFF'S CLAIMS

In his Second Amended Complaint, McQueen raises claims of race discrimination and retaliation under Title VII. (Doc. 33). In Count I, he asserts ALDOT discriminated against him by denying him equal pay that was received by similarly situated employees. *Id.*, ¶ 17. Additionally, he sues ALDOT for allowing and acquiescing to a hostile work environment by refusing to discipline Grissett for racially-based verbal harassment and physical violence. *Id.*, ¶ 18. He alleges because ALDOT refused to discipline Grissett, the harassment continued unabated. *Id.* McQueen claims ALDOT retaliated against him for his internal and external complaints by subjecting him to a sham drug screen. *Id.*, ¶ 19.

In Count II of the Second Amended Complaint, McQueen sues the three individual supervisors, Griffin, Ellis, and Boothe, arguing they allowed and acquiesced to the creation of a racially hostile work environment because they refused to discipline Grissett for his racially-based verbal harassment

8

and physical violence. *Id.*, ¶ 25. He also sues the individuals for retaliating against him for reporting and opposing discrimination in his employment. *Id.*, ¶ 26.

## V. ANALYSIS

### A. Unequal Pay Claim

McQueen asserts that his fellow white male crew members, Donald Dansby, Josh Grissett, and Marcus Sanders, made more money than he did. (Doc. 33, ¶¶ 13, 17). To the extent McQueen is attempting to raise a claim under the Equal Pay Act, his claim fails. The Equal Pay Act ("EPA"), provides in part:

> No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, **between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex** in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: Provided, That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.

29 U.S.C.A. § 206(d)(1) (emphasis added). *See Meeks v. Computer Assocs., Int'l*, 15 F.3d 1013, 1018 (11th Cir. 1994) (to establish a *prima facie* case under the EPA, plaintiff had to demonstrate that employer paid "different wages to employees of opposite sexes for equal work"). Here, McQueen has identified no female comparators, and thus ALDOT is entitled to judgment as to any claim under the Equal Pay Act.

To state a *prima facie* case of wage discrimination under Title VII based on race, McQueen must show that: "(1) he belongs to a racial minority; (2) he received low wages; (3) similarly situated comparators outside the protected class received higher compensation; and (4) he was qualified to receive a higher wage." *Cooper v. S. Co.*, 390 F.3d 695, 734–35 (11th Cir. 2004), overruled on other grounds by *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457 (2006). The Eleventh Circuit recently noted

9

in race-based or gender-based wage discrimination cases, "this Court has required the plaintiff to present a comparator who received higher compensation in order to establish a *prima facie* case." *Walker v. Fulton Cty. Sch. Dist.*, 624 F. App'x 683, 686 (11th Cir. 2015). In fiscal year 2014, it is undisputed McQueen earned more income than his fellow white male crew members. *See* (Doc. 60-5). McQueen has not presented evidence that any of his purported comparators made more money, and therefore McQueen fails to establish all the necessary elements of his claim. *See Walker*, 624 at 687 ("Walker was paid more than VanWagner. Therefore, Walker cannot use VanWagner as the comparator to establish his *prima facie* case."). Further, as it pertains to Grissett, McQueen acknowledged that Grissett is a *senior* traffic signal technician, which is a different classification and pay range. (Doc. 58-5 at 188:2–19). Thus, Grissett would not be an appropriate comparator in any event.[4]

As for McQueen's argument that he should have been making even more than his comparators due to his length of tenure, he has not proffered evidence of this. Regarding his claim he should have received step raises that his fellow crew members received, all of the other crew members passed their IMSA Level I traffic signal certification except McQueen (Doc. 59-2, ¶ 5), and McQueen's 2015–2016 performance appraisal score was "partially meets standards" which was not high enough to merit a step raise. *Id.*, ¶ 21. Accordingly, McQueen fails to establish a race-based wage discrimination claim or an EPA claim, and Defendants are entitled to final summary judgment on this issue.

    B. Hostile Work Environment

Counts I and II both claim race discrimination under Title VII based on a hostile working environment. (Doc. 33, ¶ 18). Title VII prohibits a hostile work environment in which "a series of separate acts ... collectively constitute one 'unlawful employment practice.'" *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002) (citing 42 U.S.C. § 2000e-5(e)(1)). To establish a claim of

---

[4] Dansby, Sanders, and McQueen are the same classification—traffic signal technician. (Doc. 58-3 at 100:5–9).

a hostile work environment, an employee must prove that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993). When the harassment claim is based on race, the employee must prove five elements: "(1) that he is a member of a protected class; (2) that he was subjected to unwelcome racial harassment; (3) that the harassment was based on his race; (4) that the harassment was severe or pervasive enough to alter the terms and conditions of his employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for the environment under a theory of either vicarious or direct liability." *Adams v. Austal, U.S.A., L.L.C.*, 754 F.3d 1240, 1248–49 (11th Cir. 2014) (citing *Miller v. Kenworth of Dothan, Inc*., 277 F.3d 1269, 1275 (11th Cir. 2002)).

It is undisputed McQueen is a member of a protected class. (Doc. 57 at 21). As for complaints of unwelcome racial harassment, McQueen did not have a complaint about any other members of his crew, except Grissett. His claim of racial discrimination stems from mistreatment by Grissett, and the supervisors purportedly doing nothing about it. (Doc. 58-3 at 94:13–19, 95:6–8). Specifically, McQueen testified that Grissett made him feel unwelcome, belittled him, talked down to him, and criticized his work. *Id.* at 105–10. McQueen's primary complaint was the April 22, 2014, incident in the truck with Grissett. While the alleged behavior of Grissett was offensive, and no doubt unwelcome, the comments did not contain a racial animus. That is, there is nothing in the allegations to indicate the harassment was based on McQueen's race. McQueen does not allege Grissett used any racially derogatory language or epithets directed toward him. Thus, McQueen's hostile work environment claim fails to meet the third element of establishing that the harassment was due to his race.

Even if racial animus in Grissett's comments and tone can be inferred by virtue of McQueen being the only African-American on the crew, McQueen's hostile work environment claim nevertheless fails because he has not presented evidence that the alleged harassment was severe or pervasive enough

11

or that it altered the terms and conditions of his employment. This fourth element requires a plaintiff to prove that the work environment is both "subjectively and objectively hostile." *Adams*, 754 F.3d at 1249 (citing *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999)). Although McQueen may have subjectively perceived that the harassment was severe enough to change the terms or conditions of his employment, the court cannot say that under the totality of the circumstances this perception was objectively reasonable.

To evaluate whether McQueen's work environment is objectively hostile, the court considers: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Mendoza*, 195 F.3d at 1246. The evidence reveals Grissett criticized the way McQueen performed his work and cursed and pushed him while they were riding together. With the above factors in mind, the court finds, under the totality of the circumstances, a reasonable person would not find Grissett's conduct to be so severe or pervasive that it altered the terms or conditions of McQueen's employment.

As for the racially derogatory comment made by one of the female employees which was overheard by McLeod, *see* (Doc. 78-2 at 7–8), a single comment in these circumstances would not be considered pervasive, and there is no evidence in any event that McQueen was aware of it. Accordingly, that comment cannot be used to form the basis of his hostile work environment claim. *See, e.g., Adams*, 754 F.3d at 1250 ("district court also correctly limited its consideration to incidents of racial harassment of which the individual employees were aware"); *McCann v. Tillman*, 526 F.3d 1370, 1379 (11th Cir. 2008) (concluding that over more than two years of employment the use of one racially derogatory term in front of the plaintiff and two racial epithets outside of the plaintiff's presence was insufficient to support a hostile work environment claim); *Mahone v. CSX Transp., Inc.*, 652 Fed. App'x 820, 823 (11th Cir. 2009) (evidence reflecting a single incident in which a coworker used a racially-charged word during a meeting but the conduct was not physically threatening or humiliating,

and the plaintiff suffered no adverse employment action was not objectively reasonable to support hostile work environment claim). The court finds Defendants are entitled to summary judgment as to McQueen's discrimination claims based upon a hostile working environment.

*C. Retaliation*

Title VII prohibits retaliation against an employee "because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing [thereunder]." 42 U.S.C. § 2000e–3(a). A *prima facie* case of retaliation under Title VII requires the plaintiff to show that: (1) he engaged in an activity protected under Title VII; (2) he suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action. *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008) (citing *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001)).

McQueen's filing of a charge of discrimination with the EEOC constitutes statutorily protected activity. In this circuit, courts have required a plaintiff to establish an "ultimate employment decision" or make some other showing of substantiality in the employment context in order to establish an adverse employment action. *Crawford*, 529 F.3d at 970. An ultimate employment decision has been defined to include "termination, failure to hire, or demotion." *Id.* (citations omitted). Where there is no ultimate employment decision, the adverse employment action must, "alter[ ] the employee's compensation, terms, conditions, or privileges of employment, deprive him or her of employment opportunities, or adversely affect [ ] his or her status as an employee." *Id.* (citations omitted).

Here, McQueen claims he was subjected to a "sham drug test." The evidence reveals, however, that as a commercial driver's license holder, McQueen has been subject to random drug and alcohol testing since being employed with ALDOT. Thus, there is no indication of a connection between the testing and his filing a charge of discrimination. Further, the results of the test conducted in May 2014 were negative, and thus there was no adverse consequence resulting from it.

13

Although not raised in his Second Amended Complaint, McQueen additionally testified that Boothe threatened to reprimand him which he believes was in retaliation of his protected activity. (Doc. 77 at 12). As a preliminary matter, this exchange could not have served as the basis for McQueen's complaint for retaliation because the reprimand occurred after McQueen had filed the lawsuit. (Doc. 58-4 at 153:23–154:2). Additionally, there is no indication Boothe was aware of the EEOC charge at the time of the filing of the lawsuit. (Doc. 59-2, ¶ 23). Moreover, a "threatened reprimand" is not an ultimate employment decision such as "termination, failure to hire, or demotion," *see Crawford*, 529 F.3d at 970, nor is there any evidence that the "threatened reprimand" altered the terms and conditions of his employment.

McQueen offers the Declaration of Barron who states Boothe questioned Barron about McQueen's job performance after McQueen filed his EEOC charge and this lawsuit. (Doc. 77 at 12) (referring to Doc. 78-2 at 2–5). Thereafter, McQueen claims that Boothe gave him a low job rating. The Eleventh Circuit has recognized that "a poor performance evaluation that directly results in the denial of a pay raise of any significance clearly affects an employee's compensation and thus constitutes an adverse employment action under Title VII." *Crawford*, 529 F.3d at 971 (citing *Gillis v. Ga. Dep't of Corr.*, 400 F.3d 883, 888 (11th Cir. 2005)). However, again, this was not raised in his pleadings or his deposition as a basis for his retaliation claim, but even assuming McQueen could establish that the low job rating was an adverse employment action, that Boothe was aware of McQueen's statutorily protected activity at the time the low rating was given, and that there was a causal connection between the two such that McQueen can establish a *prima facie* case of retaliation, his claim nevertheless fails.

In this circuit, courts apply the *McDonnell Douglas* burden-shifting framework to analyze retaliation claims. *Gerard v. Bd. of Regents of State of Ga.*, 324 F. App'x 818, 825 (11th Cir. 2009) (citing *Holifield v. Reno*, 115 F.3d 1555, 1564–66 (11th Cir. 1997) (per curiam)). Under *McDonnell Douglas*, a plaintiff bears the initial burden of presenting sufficient evidence to allow a reasonably jury to determine that he has satisfied the elements of his *prima facie* case. *McDonnell Douglas Corp. v.*

14

*Green*, 411 U.S. 792, 802 (1973). If plaintiff is able to establish a *prima facie* case, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the employment decision. *Id.* If defendant provides such reason, the burden shifts back to the plaintiff to show that the defendant's stated reason was pretextual. *Id.* at 804.

Defendants have filed the affidavit of Jason Boothe who has been McQueen's supervisor since 2009. (Doc. 59-2, ¶ 19). He has disciplined McQueen on four separate occasions for violation of ALDOT's policies and procedures. *Id.* Three of the four disciplinary incidents occurred prior to the incident in the truck with Grissett. The one reprimand that occurred after McQueen filed his May 2014 EEOC charge of discrimination occurred nearly two years later in April 2016. *Id.* Boothe states that none of his discipline of McQueen was in retaliation for McQueen filing the EEOC charge or this lawsuit. *Id.*, ¶ 20. Rather, any disciplinary action taken was due to McQueen's violation of ALDOT's policies and procedures. *Id.* Thus, Defendants have articulated a legitimate, non-discriminatory reason for the action.

To show that Defendants' stated reason is a pretext, McQueen must present sufficient evidence "to permit a reasonable fact finder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997) (citation omitted). McQueen has failed to come forward with any evidence that the reason given is a pretext, and therefore, his retaliation claim fails.

    *D. Section 1983 Claim*

In their motion, Defendants argue that McQueen is unable to establish the elements of a claim against the individual supervisors under 42 U.S.C. § 1983. "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). McQueen asserts conclusory allegations that he is entitled to relief under § 1983 because of "reckless, malicious, and willful actions" of Defendants Boothe, Ellis, and

Griffin. (Doc. 33, ¶ 30). In his brief in opposition, he fails to respond to Defendants' arguments other than to state that intentional discrimination in the workplace based on race violates federal law. (Doc. 77 at 21). McQueen fails to direct the court to any facts supporting intentional discrimination by these individual Defendants. Because the court concludes above that McQueen's discrimination and retaliation claims fail, his § 1983 claims which are based on the same set of facts similarly must fail. *See Abel v. Dubberly*, 210 F.3d 1334, 1338 (11th Cir.2000) (holding that Title VII and § 1983 claims have the same elements where the claims are based on the same set of facts).

Defendants alternatively assert they are entitled to qualified immunity in their individual capacities from McQueen's § 1983 claims. Because the court has concluded Defendants are entitled to final summary judgment on the discrimination and retaliation claims, the court need not reach the issue of whether the individual Defendants are entitled to qualified immunity. In any event, McQueen likely waived the issue as he did not substantively respond to the qualified immunity argument raised in Defendants' motion. The Eleventh Circuit has held, "[w]hen a defendant has moved for summary judgment on the basis of qualified immunity, 'the plaintiff may not rely on the facts contained in the complaint, but must raise genuine issues of material fact to counter the facts supporting a defendant's summary judgment motion based on qualified immunity.' *Hutton v. Strickland*, 919 F.2d 1531, 1536–37 (11th Cir.1990). Failure to do so may result in waiver or abandonment of the issue." *Case v. Eslinger*, 555 F.3d 1317, 1329 (11th Cir. 2009). Here, McQueen failed to respond to Defendants' arguments regarding their entitlement to qualified immunity, and thus he waived the issue.

## VI. CONCLUSION AND ORDER

For the reasons stated, it is **ORDERED:**

Defendants, Sharon Ellis, Jason Boothe, Mike Griffin, and Alabama Department of Transportation's motion for final summary judgment as to all claims of the Plaintiff, Claude McQueen, (Doc. 56) is **granted**. Defendants' motion to strike the Jennifer McLeod Declaration (Doc. 79) is

**denied as moot**. The Court will enter a separate final judgment, and the Clerk is directed to close this docket.

    **DONE** and **ORDERED** this 30th day of June, 2017.

                                                                 DAVID A. BAKER
                                        UNITED STATES MAGISTRATE JUDGE